# JUDGE BAER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

12 CV 55586 (B-ECF CASE)

---

BARBARA KEILER, MONA GAY THOMAS,
and LINDA BARRETT, on behalf of themselves
and all others similarly situated,

Plaintiffs,

v.

HARLEQUIN ENTERPRISES LIMITED, a
Canadian corporation, HARLEQUIN
BOOKS S.A., a Swiss company, and
HARLEQUIN ENTERPRISES B.V., a Dutch
company,

Defendants.

**12 Civ.**

**CLASS ACTION COMPLAINT**

RECEIVED
JUL 19 2012
U.S.D.C. S.D. N.Y.
CASHIERS

**JURY TRIAL DEMANDED**

---------------------------------------------------------------x

Plaintiffs Barbara Keiler, Mona Gay Thomas, and Linda Barrett, on behalf of

themselves and all others similarly situated, by their counsel, as and for their Complaint

against Defendants, allege as follows:

## Nature of the Case

1.     Plaintiffs and the other class members are authors who entered into

standard form publishing agreements between 1990 and 2004 to write books under the

*Harlequin* imprint and related imprints ("*Harlequin* books").  Defendant Harlequin

Enterprises Limited ("Harlequin Enterprises") is the publisher of *Harlequin* books and

the world's leading publisher of romance fiction.  Defendant Harlequin Books S.A. and

its predecessor Defendant Harlequin Enterprises B.V. (referred to herein jointly as

"Harlequin Switzerland") are owned and controlled by Harlequin Enterprises and were

set up by Harlequin Enterprises for tax purposes in the Canton of Fribourg in Switzerland.

2.      Although Defendant Harlequin Enterprises has at all times been the publisher of *Harlequin* books, and Defendant Harlequin Switzerland does not perform any publishing functions, for tax reasons Harlequin Enterprises required the Plaintiffs to enter into the publishing agreements, which it drafted, with Harlequin Switzerland as the "Publisher." Harlequin Switzerland's sole role was to sign the publishing agreements prepared by Harlequin Enterprises and then to send out royalty statements and payments in its name. Plaintiffs at all times dealt with Harlequin Enterprises as the publisher of their works.

3.      The 1990-2004 standard form publishing agreements provided that the Plaintiffs were to be paid 50% of the net receipts of the "Publisher" from the exercise, sale, or license of digital rights to their works. Since Harlequin Enterprises is, and has always been, the  "Publisher," its net receipts amount to at least 50% of the cover price of the e-books, Plaintiffs are entitled to receive 50% of those net receipts.

4.      Harlequin Enterprises has nonetheless claimed that it had to obtain a "license" from Harlequin Switzerland to publish Plaintiffs' e-books. Harlequin Enterprises has claimed that Plaintiffs' 50% royalty should therefore be based on the net receipts of Harlequin Switzerland from this "license," which amounts to only 6% to 8% of the e-books' cover price.

5.      What this means to the Plaintiffs can be illustrated by an e-book with a hypothetical cover price of $8.00. The "net receipts" made by Harlequin Enterprises from the exercise, sale, or license of e-book rights would be at least $4.00, of which

Plaintiffs would be entitled to $2.00 based on their 50% royalty. Computing the "net receipts" based on the "license" between Harlequin Switzerland and Harlequin Enterprises, Plaintiffs' 50% royalty amounts to only 24 to 32 cents.

6.      Plaintiffs contend in this action Defendant Harlequin Enterprises should be recognized as the "Publisher" under principles of assignment, agency, assumption, and alter ego liability, and not on the basis of a self-serving "license" created for tax purposes. Plaintiffs' e-book royalties should therefore be computed on Harlequin Enterprises' net receipts from the exercise, sale, or license of e-book rights. Plaintiffs claim, alternatively, that even if Harlequin Switzerland were to be regarded as the "Publisher," the 6% to 8% "license" that it gave to Harlequin Enterprises was not "equivalent to the amount reasonably obtainable" from an unrelated party, as required by the publishing agreements.

7.      This action seeks damages for the Defendants' breach of the 1990 to 2004 publishing agreements in not paying Plaintiffs and the other class members the royalties to which they are entitled.

## Jurisdiction and Venue

8.      This Court has jurisdiction over all the claims in the Complaint pursuant to 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, exclusive of interest and costs, and there is diversity of citizenship between proposed class members and Defendants because members of the Class are citizens of various states of the United States and Defendants are citizens of foreign states.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).  The publishing agreements at issue in this action provide that New York shall be the venue for any disputes, and that the laws of the State of New York apply.

## The Parties

10.      Plaintiff Barbara Keiler ("Keiler") resides in Sudbury, Massachusetts.  She is an author writing under the name "Judith Arnold," and entered into 21 publishing agreements, covering 26 works, with Defendant Harlequin Books S.A. or its predecessor Defendant Harlequin Enterprises B.V., during the period 1990 to 2003.  (A list of her 21 publishing agreements is attached hereto as Exhibit "1.")

11.      Plaintiff Mona Gay Thomas ("Thomas") resides in Birmingham, Alabama.  She is an author writing under the name "Gayle Wilson," and entered into 27 publishing agreements, covering 40 works, with Defendant Harlequin Books S.A. or its predecessor Defendant Harlequin Enterprises B.V., during the period 1993 to 2003.  (A list of her 27 publishing agreements is attached hereto as Exhibit "2.")

12.      Plaintiff Linda Barrett ("Barrett") resides in Wimauma, Florida.  She is an author who entered into five publishing agreements, covering eight works, with Defendant Harlequin Books S.A. during the period 2000 to 2002. (A list of her five publishing agreements is attached hereto as Exhibit "3.")

13.      Defendant Harlequin Enterprises is a Canadian corporation, with its principal place of business located at 225 Duncan Mill Road, Don Mills, Toronto, Ontario M3B 3K9, Canada.  Harlequin Enterprises is a wholly owned subsidiary of Torstar Corporation, the publisher of Canada's largest metropolitan daily newspaper, *The*

*Toronto Star*.  Harlequin Enterprises does and transacts business in the State of New York and maintains an office at 233 Broadway, Suite 1001, New York, N.Y. 10279.

14.     Defendant Harlequin Books S.A. is a Swiss company located at Route de Chantemerle 58, 1763 Granges-Paccot, Canton of Fribourg, Switzerland.  Upon information and belief, it is owned, dominated and controlled by Defendant Harlequin Enterprises.

15.     Defendant Harlequin Enterprises B.V. was a Dutch company that had been registered to do business in Switzerland and is the predecessor of Defendant Harlequin Books S.A.  Upon information and belief, it was owned, dominated and controlled by Defendant Harlequin Enterprises.

## Class Allegations

16.     Plaintiffs bring this action as a class action for monetary relief pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class: All natural persons, and their heirs and assigns, in the United States, Canada, the United Kingdom, the Republic of Ireland, Australia and New Zealand, who during the period 1990 to 2004 (the "Class Period"), entered into a standard form book publishing agreement with Defendant Harlequin Enterprises B.V. or Defendant Harlequin Books S.A., that contains a provision requiring the "Publisher" to pay royalties of 50% of net receipts for the exercise, sale, or license of e-book rights (the "Class").

17.     Excluded from the Class are Defendants herein, and any person, firm, trust, corporation, or other entity related to or affiliated with Defendants, including, without limitation, persons who are officers, directors, employees, agents, associates, or partners of Defendants.

18.     This action is properly maintained as a class action.  The Class satisfies all of the requirements of Rule 23 for maintaining a class action.

19.     *Numerosity.*  The Class is so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  There are about 1000 members of the Class, who are geographically dispersed throughout the United States, Canada, the United Kingdom, the Republic of Ireland, Australia, and New Zealand.

20.     *Existence and predominance of common questions of law and fact.*  There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  Defendants pursued a common course of conduct toward the Class as alleged. This action arises out of a common nucleus of operative facts.  Common questions of law and fact include, without limitation:

a.     Whether Defendants imposed on its authors standard form publishing agreements during the Class Period;

b.     Whether such agreements contain a royalty provision of 50% of net receipts for the exercise, sale, or license of e-book rights;

c.     Whether Defendants breached the express terms of their publishing agreements with members of the Class;

d.     Whether Defendants have failed to pay Plaintiffs and the Class the royalties to which they are entitled under the publishing agreements for the exercise, sale, or license of e-book rights;

e.     Whether Defendant Harlequin Enterprises is liable to Plaintiffs and the other class members for unjust enrichment; and

f.      Whether Plaintiffs and the Class have sustained damages and, if so, what is the proper measure and appropriate formula to be applied in determining such damages.

21.     *Typicality.*  The claims of Plaintiffs are typical of those of the Class, and Defendants have no defenses that are unique to any of the Plaintiffs.

22.     *Adequacy of representation.*   Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse or antagonistic to the interests of other members of the Class.  Plaintiffs have retained experienced counsel, competent in the prosecution of class action litigation.

23.     *Superiority.*    A class action is superior to other methods for the fair and efficient adjudication of the claims asserted herein.  A class action will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of time and expense that the prosecution of numerous individual actions would entail.  Class treatment will also permit the adjudication of relatively small claims by many Class members who could not otherwise afford to seek legal redress for the wrongs complained of in this action. Plaintiffs do not anticipate that any unusual difficulties are likely to be encountered in the management of this class action.

## Harlequin Enterprises and Harlequin Switzerland

24.     Defendant Harlequin Enterprises is the world's largest publisher of romance fiction, publishing more than 110 titles per month in over 34 languages in over 114 international markets on six continents, currently written by over 1200 authors.

Harlequin controls the publication of *Harlequin* books around the world from its offices in Toronto, Canada, where it has about 400 employees.

25.     In about 1983, Harlequin Enterprises, for tax purposes, registered Defendant Harlequin Enterprises B.V. under the laws of the Canton of Fribourg in Switzerland, and in about 1994, for tax purposes, Defendant Harlequin Enterprises registered Defendant Harlequin Books S.A. under the laws of the Canton of Fribourg in Switzerland.  The two Harlequin Switzerland entities have each had about five employees.

26.     Defendant Harlequin Enterprises, at all times relevant herein, has owned, dominated, and controlled the affairs and the business of Harlequin Switzerland.

### The Publishing Agreements

27.     Prior to the creation of Harlequin Switzerland, authors writing *Harlequin* books were required by Harlequin Enterprises to sign standard form publishing agreements with Harlequin Enterprises' name appearing in the agreements as the "Publisher."

28.     Starting in about 1983, Harlequin Enterprises required its authors to sign standard form publishing agreements with Defendant Harlequin Enterprises B.V. appearing in the agreements as the "Publisher."

29.     Starting in about 1994, Harlequin Enterprises required its authors to sign standard form publishing agreements with Defendant Harlequin Books S.A. appearing in the agreements as the "Publisher."

30.     This action concerns publishing agreements entered into from 1990 to 2004 between Plaintiffs and the other class members and Harlequin Switzerland (the "Publishing Agreements").

31.     The Publishing Agreements were written and prepared by Harlequin Enterprises as standard form agreements. Harlequin Enterprises required Plaintiffs and the other class members to accept, and Harlequin Enterprises refused to negotiate, most of the material provisions in those agreements including, without limitation, the provisions at issue in this action.

32.     In the Publishing Agreements, Plaintiffs and other class members granted and assigned to the "Publisher" "on a sole and exclusive basis all the rights in and to [their Works] in any country throughout the world under various imprints and trade names during the full term of copyright." The Publishing Agreements provided further that the "Publisher" "shall have the sole and exclusive right to execute, sell, license or sublicense said rights subject to the sharing of net proceeds with [the Authors] as provided herein."

33.     The Publishing Agreements provided that "Publisher may assign this Agreement to any related legal entity" and that "Publisher may delegate any of its editorial, administrative and/or other responsibilities pursuant to this Agreement to its parent company or to an affiliate, subsidiary or other related legal entity."

34.     At the direction of Harlequin Enterprises, Harlequin Switzerland executed the Publishing Agreements as the "Publisher" even though it was at all relevant times Harlequin Enterprises, not Harlequin Switzerland, that acted as the "Publisher."

35.     Although the Publishing Agreements named Harlequin Switzerland as the "Publisher," at no relevant time has Harlequin Switzerland performed any traditional publishing functions.

36.     As directed and controlled by Harlequin Enterprises, Harlequin Switzerland has at all relevant times performed only ministerial functions with respect to the Publishing Agreements, such as executing the Publishing Agreements and any amendments to those agreements (all of which were prepared by Harlequin Enterprises' legal staff and other employees) and making royalty payments to the authors.

37.     In the very limited negotiation of the Publishing Agreements allowed to them, Plaintiffs and the other class members were required to deal with Harlequin Enterprises as the "Publisher" and not with Harlequin Switzerland.

38.     Plaintiffs and the other class members were required to submit their manuscripts under the Publishing Agreements to Harlequin Enterprises as the "Publisher" and not to Harlequin Switzerland.

39.     In all editorial matters relating to the Publishing Agreements, Plaintiffs and the other class members were required to deal with Harlequin Enterprises as the "Publisher" and not with Harlequin Switzerland.

40.     When the works that were the subject of the Publishing Agreements were actually published, whether in print form or as e-books, their copyright pages identified Harlequin Enterprises as the publisher, along with the statement "[t]his edition published by arrangement with [Harlequin Switzerland]."

41.     At all relevant times, Harlequin Enterprises, not Harlequin Switzerland, performed the functions provided in the Publishing Agreements for the "Publisher" in

exercising, selling, or licensing the e-book rights assigned by Plaintiffs and the other class members.

42.     At all relevant times, Harlequin Enterprises has acted as and has been the owner and assignee of all of the rights assigned by Plaintiffs and the other class members to Harlequin Switzerland in the Publishing Agreements, and not a mere licensee of certain rights.

### The "All Other Rights" and "Other Rights" Clauses in the Publishing Agreements

43.     Several years ago, Harlequin Enterprises began to exercise, sell, or license e-book rights to the works that are the subject of the Publishing Agreements.

44.     Royalties for the exercise, sale, or license of e-book rights were covered by two general clauses in the Publishing Agreements, an "All Other Rights" clause and an "Other Rights" clause.

45.     The All Other Rights clause (the "AOR Clause") provides as follows:

> "On all other rights exercised by Publisher or its Related Licensees fifty percent (50%) of the Net Amount Received by Publisher for the license or sale of said rights.  The Net Amount Received for the exercise, sale or license of said rights by Publisher from a Related Licensee shall, in Publisher's estimate, be equivalent to the amount reasonably obtainable by Publisher from an Unrelated Licensee for the license or sale of the said rights."

46.     The Other Rights clause provides as follows:

> "If Publisher licenses, sublicenses or sells to an Unrelated Licensee any of the following rights to the Work anywhere in the world, in any language, Author's and Publisher's share of net amount received by Publisher for said license, sublicense or sale shall be apportioned as follows . . . Any other rights to reproduce, adapt, publish or otherwise deal in any manner whatsoever now existing or that may hereafter come into existence. [Author's share] 50%  [Publisher's Share] 50%."

11

47.     Under the two provisions quoted above, Plaintiffs and other class members are owed e-book royalties of 50% of the net amount received by the "Publisher" from the exercise, sale, or license of e-book rights.

48.     Since Harlequin Enterprises is the owner and/or the assignee of rights held by the "Publisher" under the Publishing Agreements, and not a mere licensee, Plaintiffs and the other class member are owed e-book royalties of 50% of the net amount received by Harlequin Enterprises from the exercise, sale, or license of e-book rights in their works.

49.     Harlequin Enterprises has been exercising, selling, or licensing e-book rights in the works covered by the Publishing Agreements directly to consumers on its website www.Harlequin.com and to e-book retailers such as Amazon.  Harlequin Enterprises has been paid substantial amounts of money from the exercise, sale, or license of such rights, amounting to 50% or more of the cover price of the e-books.

50.     In 2011, Harlequin Enterprises sent written communications to Plaintiffs and the other class members in which it took the position that royalties for e-books were covered by the AOR Clause in the Publishing Agreements and that the authors' 50% royalty was to be calculated based on the net amount received by Harlequin Switzerland, from a "license" that Harlequin Enterprises claims Harlequin Switzerland granted to it to publish the e-books.  Harlequin Enterprises claimed in those communications that the net amount received by Harlequin Switzerland was 6% to 8% of the cover price of the e-books, and that the royalties owed to Plaintiffs and to other class members were therefore 50% of that amount, or 3% to 4% of the cover price.

51.     Under the Publishing Agreements, Defendants have been paying Plaintiffs and the other class members e-book royalties of 3% to 4% of the cover price based on the net amount received by Harlequin Switzerland from the claimed "license" granted to Harlequin Enterprises, far less than what Plaintiffs and the other class members would have been paid if their royalties were based, as they should have been, on the net amount received by Harlequin Enterprises.

### FIRST CLAIM FOR RELIEF
**(Breach of Contract)**

52.     Plaintiffs repeat and reallege paragraphs 1-51 above, as if fully set forth herein.

53.     The operative intent of Defendants was to assign to Defendant Harlequin Enterprises all of the rights granted by Plaintiffs and the other class members to the "Publisher" under the Publishing Agreement.

54.     Defendant Harlequin Enterprises is the assignee of the rights granted by Plaintiffs and the other class members to the "Publisher" in the Publishing Agreements, and not a mere licensee.

55.     Defendants have materially breached the terms of the Publishing Agreements by not paying Plaintiffs and the other class members 50% of the net receipts received by Harlequin from the exercise, sale, or license of e-book rights to their works.

56.     Plaintiffs and the other class members have been damaged in amounts to be determined.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

57.    Plaintiffs repeat and reallege paragraphs 1-51 above, as if fully set forth herein.

58.    At all times relevant herein, Harlequin Switzerland has taken actions on behalf of and for the benefit of Harlequin Enterprises including, without limitation, entering into the Publishing Agreements with Plaintiffs and the other class members, in order for Harlequin Enterprises to acquire the rights to their works.

59.    At all times relevant herein, Harlequin Enterprises has controlled the actions of Harlequin Switzerland.

60.    At all times relevant herein, Harlequin Switzerland has acted as the agent, and at the behest, of Harlequin Enterprises.

61.    Since Harlequin Switzerland is the agent of its principal, Harlequin Enterprises, the actions of Harlequin Switzerland have been in fact, form and substance the actions of Harlequin Enterprises.

62.    Defendants have materially breached the terms of the Publishing Agreements by not paying Plaintiffs and the other class members 50% of the net receipts received by Harlequin Enterprises from the exercise, sale, or license of e-book rights to their works.

63.    Plaintiffs and the other class members have been damaged in amounts to be determined.

## THIRD CLAIM FOR RELIEF
### (Breach of Contract)

64.     Plaintiffs repeat and reallege paragraphs 1-51 above, as if fully set forth herein.

65.     Prior to and subsequent to the execution of the Publishing Agreements, Defendant Harlequin Enterprises performed the role of the "Publisher" under the Publishing Agreements.

66.     By its actions in acting as the "Publisher" under the Publishing Agreements, Harlequin Enterprises has assumed the obligations of the "Publisher" under those agreements.

67.     Defendants have materially breached the terms of the Publishing Agreements by not paying Plaintiffs and the other class members 50% of the net receipts received by Harlequin Enterprises from the exercise, sale, or license of e-book rights to their works.

68.     Plaintiffs and the other class members have been damaged in amounts to be determined.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract)

69.     Plaintiffs repeat and reallege paragraphs 1-51 above, as if fully set forth herein.

70.     With the knowledge and acquiescence of Harlequin Switzerland, Harlequin Enterprises has knowingly accepted the benefits accorded to the "Publisher" under the Publishing Agreements.

71.     Defendants should be estopped from denying that Harlequin Enterprises has assumed the responsibilities of the "Publisher" under the Publishing Agreements.

72.     Defendants have materially breached the terms of the Publishing Agreements by not paying Plaintiffs and the other class members 50% of the net receipts received by Harlequin Enterprises from the exercise, sale, or license of e-book rights to their works.

73.     Plaintiffs and the other class members have been damaged in amounts to be determined.

## FIFTH CLAIM FOR RELIEF
### (Breach of Contract)

74.     Plaintiffs repeat and reallege paragraphs 1-51 above, as if fully set forth herein.

75.     At all relevant times, Defendant Harlequin Enterprises has dominated and controlled the business and affairs of Harlequin Switzerland.

76.     At all relevant times, Harlequin Enterprises' domination and control of Harlequin Switzerland has been such that Harlequin Switzerland has not had a separate will of its own with respect to the matters at issue in this lawsuit.

77.     At all relevant times, Harlequin Enterprises' domination and control of Harlequin Switzerland has been such that Harlequin Switzerland has not had any discretion with respect to the matters at issue in this lawsuit.

78.     Harlequin Enterprises' domination and control of Harlequin Switzerland has been used to commit wrongs and unjust acts that have injured Plaintiffs and the other class members, including without limitation by requiring Plaintiffs and the other class members to enter into the Publishing Agreements with Harlequin Switzerland and then

by basing their e-book royalties on a "license" that Harlequin Enterprises claimed it had

to obtain from Harlequin Switzerland to publish the works of Plaintiffs and the other

class members.

79.     Harlequin Switzerland is the alter ego of Harlequin Enterprises.

80.     Defendants have materially breached the terms of the Publishing

Agreements by not paying Plaintiffs and the other class members 50% of the net receipts

received by Harlequin Enterprises from the exercise, sale, or license of e-book rights to

their works.

81.     Plaintiffs and the other class members have been damaged in amounts to

be determined.

### SIXTH CLAIM FOR RELIEF
### (Breach of Contract)

82.     Plaintiffs repeat and reallege paragraphs 1-51 above, as if fully set forth

herein.

83.     Even if Plaintiffs' and the other class members' e-book royalties were

properly based on the net receipts of Harlequin Switzerland as the "Publisher," and not

on the net receipts of Harlequin Enterprises, from the exercise of e-book rights,

Defendants have materially breached the terms of the Publishing Agreements because

they have not complied with the provisions of the AOR Clause, which requires that "[t]he

Net Amount Received for the exercise, sale or license of said rights by Publisher from a

Related Licensee shall, in Publisher's estimate, be equivalent to the amount reasonably

obtainable by Publisher from an Unrelated Licensee for the license or sale of the said

rights."

84.     The claimed "license" from Harlequin Switzerland to Harlequin Enterprises in the amount of 6% to 8% of the cover price of the works is not "equivalent to the amount reasonably obtainable by Publisher from an Unrelated Licensee for the license or sale of the said rights."

85.     The amount reasonably obtainable by a publisher from an unrelated licensee for the license or sale of the said rights is at least 50% of the cover price of the works.

86.     Plaintiffs and the other class members have been damaged in amounts to be determined.

**SEVENTH CLAIM FOR RELIEF**
**(Unjust Enrichment/**
**Defendant Harlequin Enterprises)**

87.     Plaintiffs repeat and reallege the allegations in paragraphs 1-51 above, as if fully set forth herein.

88.     The Publishing Agreements, which were drafted and prepared by Defendant Harlequin Enterprises, arguably do not contain a provision setting the amount of the royalty to be paid to the Plaintiffs and the other class members in the event that the "Publisher" engages in the "sale" of e-books, as opposed to the "license" of e-book rights.

89.     To the extent that it is determined that Harlequin Enterprises has exercised e-book rights by marketing e-books over its website, or by other means, and if it is determined that such exercise is a "sale" of e-books and not a "license" of e-book rights, Harlequin Enterprises has been unjustly enriched at the expense of Plaintiffs and the other class members.

90.     Equity and good conscience militate against permitting Harlequin Enterprises to retain the amounts received from the "sale" of the e-books, and those amounts should be turned over to Plaintiffs and the other class members.

## Prayer for Relief

**WHEREFORE,** Plaintiffs respectfully request that this Court:

1. Certify the Class and appoint Plaintiffs and their counsel as the Class representatives;

2. On the First Claim for Relief, enter judgment against the Defendants for the damages suffered by Plaintiffs and the other class members in amounts to be determined;

3. On the Second Claim for Relief, enter judgment against the Defendants for the damages suffered by Plaintiffs and the other class members in amounts to be determined;

4. On the Third Claim for Relief, enter judgment against the Defendants for the damages suffered by Plaintiffs and the other class members in amounts to be determined;

5. On the Fourth Claim for Relief, enter judgment against the Defendants for the damages suffered by Plaintiffs and the other class members in amounts to be determined;

6. On the Fifth Claim for Relief, enter judgment against the Defendants for the damages suffered by Plaintiffs and the other class members in amounts to be determined;

7. On the Sixth Claim for Relief, enter judgment against the Defendants for the damages suffered by Plaintiffs and the other class members in amounts to be determined;

8. On the Seventh Claim for Relief, enter judgment against Defendant Harlequin Enterprises for the damages suffered by Plaintiffs and the other class members in amounts to be determined;

9. Award prejudgment interest, costs and reasonable attorney's fees; and

10. Grant such other and further relief as the Court finds just and proper.

**<u>Jury Demand</u>**

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  July 19, 2012

David B. Wolf (DW-2077)
DAVIDWOLFLAW  pllc
One Grand Central Place
60 East 42nd Street, Suite 4700
New York, NY 10165
Tel. 212.485.9808
Fax 212.485.9809
david@davidwolflaw.com

Michael J. Boni
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel. 610.822.0200
Fax 610.822.0206
MBoni@bonizack.com

*Attorneys for Plaintiffs*

**Exhibit "1" to the Complaint - Publishing Agreements – Barbara Keiler (writing as Judith Arnold) – Page One of Two**

| Contract # | Contract date | Title | Year First Published |
|---|---|---|---|
| **With Defendant Harlequin Enterprises B.V. as the "Publisher"):** | | | |
| 21676/01 | 11/16/90 | **THE WOMAN DOWNSTAIRS** | 1992 |
| 21907/01 | 5/25/92 | **JUST LIKE ROMEO AND JULIET** (Contract title: Time and Tide) | 1993 |
| 21950/01 | 9/10/92 | **THE PARENT PLAN** (Contract title: Two By Two) | 1994 |
| **With Defendant Harlequin Books S.A. as the "Publisher":** | | | |
| 22381/01 | 1/27/95 | **MARRIED TO THE MAN** (Contract title: Made for Marriage) | 1996 |
| 22385/01 | 2/1/95 | **A STRANGER'S BABY** (Mallory & Liam) | 1996 |
| 22612/01 | 2/9/96 | **COURTING TROUBLE** | 1997 |
| 22615/01 | 2/15/96 | **RICH MAN, POOR MAN** (Contract title: How to Marry a Millionaire 3) | 1997 |
| 22676/01 | 5/14/96 | **LEGACY OF SECRETS** (Contract title: Katherine & Drew's Story) | 1998 |
| 22704/01 | 6/24/96 | **FATHER FOUND** (Contract title: The Real McCoy) | 1997 |
| 22949/01/03 | 10/16/97 | **THE WRONG BRIDE** (Contract title: Revenge) | 1999 |
| | | **FOUND: ONE SON** (Contract title: Finders Keepers 2) | 1999 |
| 23180/01 | 1/4/99 | **HER SECRET LOVER** (Contract title: Man of the Hour) | 1999 |
| 23212/01/01 | 3/8/99 | **DR. DAD** (Contract title: Father and the Star) | 2000 |
| | | **'TIS THE SEASON** (Contract title: Found: One Dad) | 2000 |
| 23254/01 | 4/29/99 | **BIRTHRIGHT** (Contract title: Riverbend #1) | 2000 |
| 23350/01/02/03 | 9/21/99 | **LOOKING FOR LAURA** (Contract title: Arnold One) | 2001 |
| | | **LOVE IN BLOOM'S** (Contract title: Arnold Two) | 2002 |
| | | **HEART ON THE LINE** (Contract title: Arnold Three) | 2003 |

**Exhibit "1" to the Complaint - Publishing Agreements – Barbara Keiler (writing as Judith Arnold) – Page Two of Two**

| Contract # | Contract date | Title | Year First Published |
|---|---|---|---|
| 23399/01 | 12/3/99 | **WISH UPON A STAR** | 2001 |
| | | (Contract title: Wish Upon a Star Barbara's Story) | |
| 23662/01 | 11/17/00 | **DADDY'S GIRL** | 2001 |
| | | (Contract title: Daddy's Girl summertime novella) | |
| 23958/01 | 11/01/01 | **HIDDEN TREASURES** | 2003 |
| M24319/01/02 | 9/30/02 | **BLOOMING ALL OVER** | 2004 |
| | | (Contract title: Judith One) | |
| | | **THE FIXER-UPPER** | 2005 |
| | | (Contract title: Judith Two) | |
| H24344/01 | 10/31/02 | **RIGHT PLACE, WRONG TIME** | 2003 |
| | | (Contract title: Sharing Time) | |
| H24383/01 | 11/21/02 | **FOOLS RUSH IN** | 2004 |
| | | (Contract title: Barbara's April Fool's Novella) | |
| H24663/01 | 9/11/03 | **ONE FOR EACH NIGHT** | 2004 |
| | | (Contract title: American Romance Novella) | |

**Exhibit "2" to the Complaint - Publishing Agreements - Mona Gay Thomas (writing as Gayle Wilson) – Page One of Two**

| Contract # | Contract date | Title | Year First Published |
|---|---|---|---|
| **With Defendant Harlequin Enterprises B.V. as the "Publisher"):** | | | |
| 30227/01 | 05/31/1993 | **THE HEART'S DESIRE** | 1994 |
| 30259/01 | 03/30/1994 | **THE HEART'S WAGER** | 1995 |
| 30284/01 | 11/07/1994 | **THE GAMBLER'S HEART** | 1996 |
| 22372/01 | 01/06/1995 | **ECHOES IN THE DARK** | 1995 |
| 22463/01 | 06/13/1995 | **ONLY A WHISPER** | 1996 |
| | *amended 10/5/95 | (Contract title: Accept the Night) | |
| 30329/01 | 11/01/1995 | **RAVEN'S VOW** | 1997 |
| 22563/01 | 11/10/1995 | **THE REDEMPTION OF DEKE SUMMERS** | 1997 |
| | | (Contract title: Summer's Son) | |
| | | **HEART OF THE NIGHT** | 1997 |
| | | | |
| **With Defendant Harlequin Books S.A. as the "Publisher":** | | | |
| 30359/01 | 07/04/1996 | **HIS SECRET DUCHESS** | 1997 |
| | | (Contract title: The Secret Heart) | |
| 22755/01/02/02 | 10/23/1996 | **RANSOM MY HEART** | 1998 |
| | | (Contract title: Coming Home I) | |
| | | **WHISPER MY LOVE** | 1998 |
| | | (Contract title: Coming Home II) | |
| | | **REMEMBER MY TOUCH** | 1998 |
| | | (Contract title: Coming Home III) | |
| 30397/01 | 06/11/1997 | **HONOR'S BRIDE** | 1998 |
| 22929/01/02/03/04 | 08/09/1997 | **NEVER LET HER GO** | 1998 |
| | | (Contract title: Merry Christmas, Baby) | |
| | | **THE BRIDE'S PROTECTOR** | 1999 |
| | | (Contract title: Men of Mystery I) | |
| | | **THE STRANGER SHE KNEW** | 1999 |
| | | (Contract title: Men of Mystery II) | |
| | | **HER BABY, HIS SECRET** | 1999 |
| | | (Contract title: Men of Mystery III) | |
| 30442/01 | 08/17/1998 | **LADY SARAH'S SON** | 1999 |
| | | (Contract title: The Winter Heart) | |
| 23136/01 | 10/07/1998 | **EACH PRECIOUS HOUR** | 1999 |
| | | (Contract title: Countdown III) | |
| 30470/01/02/03 | 02/18/1999 | **MY LADY'S DARE** | 2000 |
| | | **ANNE'S PERFECT HUSBAND** | 2001 |
| | | **HER DEAREST SIN** | 2002 |
| | | (Contract title: The Stolen Bride) | |
| 23276/01/02 | 05/21/1999 | **HER PRIVATE BODYGUARD** | 2000 |
| | | (Contract title: The Reluctant Bodyguard) | |
| | | **RENEGADE HEART** | 2000 |
| | | (Contract title: Drew's Story) | |

**Exhibit "2" to the Complaint - Publishing Agreements - Mona Gay Thomas (writing as Gayle Wilson) – Page Two of Two**

| Contract # | Contract date | Title | Year First Published |
|---|---|---|---|
| **With Defendant Harlequin Books S.A. as the "Publisher":** | | | |
| 23307/01 | 07/06/1999 | **"Day" in NIGHT AND DAY** (Contract title: Short Story) | 2001 |
| 30484/01 | 08/20/1999 | **"My Darling Echo" in BRIDE BY ARRANGEMENT** (Contract title: Gayle's WOC Short Story) | 2000 |
| 23402/01 | 12/06/1999 | **MIDNIGHT REMEMBERED** (Contract title: Josh's Story) | 2000 |
| 23452/01 | 03/20/2000 | **THE COWBOY'S SECRET SON** (Contract title: Trueblood I) | 2001 |
| 23471/01 | 03/22/2000 | **SECRETS IN SILENCE** (Contract title: Delinsky 2-in-1) | 2001 |
| 23983/01 | 12/04/2001 | **RAFE SINCLAIR'S REVENGE** (Contract title: Fire with Fire) | 2002 |
| 24166/01 | 04/15/2002 | **ROCKY MOUNTAIN MAVERICK** (Contract title: Colorado Confidential I) | 2003 |
| 24215/01 | 06/13/2002 | **IN PLAIN SIGHT** (Contract title: Single Title #1) | 2004 |
| 24221/01 | 06/13/2002 | **"Prisoner of the Tower" in THE WEDDING CHASE** (Contract title: Historical Bridal June 03) | 2003 |
| 24268/01 | 07/31/2002 | **UNDER SURVEILLANCE** (Contract title: Wilson Intrigue) | 2003 |
| H24592/01/02/03 | 06/25/2003 | **SIGHT UNSEEN** (Contract title: #1 Blind Intrigue) | 2004 |
| | | **RULES OF ENGAGEMENT** (Contract title: #2 Blind Intrigue) | 2004 |
| | | **TAKE NO PRISONERS** (Contract title: #3 Blind Intrigue) | 2005 |
| HB80690/01/02/03 | 07/04/2003 | **WEDNESDAY'S CHILD** (Contract title: Wilson HQN I) | 2005 |
| | | **DOUBLE BLIND** (Contract title: Wilson HQN II) | 2005 |
| | | **THE INQUISITOR** (Contract title: Wilson HQN III) | 2006 |

**Exhibit "3" to the Complaint - Publishing Agreements – Linda Barrett**

| Contract # | Contract date | Title | Year First Published |
|---|---|---|---|

**<u>With Defendant Harlequin Books S.A. as the "Publisher":</u>**

| Contract # | Contract date | Title | Year First Published |
|---|---|---|---|
| 23557/01 | 6/14/00 | **LOVE, MONEY AND AMANDA SHAW** | 2001 |
| 23672/01 | 11/22/00 | **TRUE-BLUE TEXAN** | 2001 |
| 23853/01 | 6/5/01 | **APPLE ORCHARD** (Contract title: Hearts in Hiding) | 2002 |
| 23986/01 | 12/6/01 | **THE INN AT OAK CREEK** | 2003 |
| 24366/01/02/03/04 | 11/19/02 | **THE HOUSE ON THE BEACH** (Contract title: Spring) | 2004 |
| | | **NO ORDINARY SUMMER** (Contract title: Summer) | 2004 |
| | | **RELUCTANT HOUSEMATES** (Contract title: Fall and Winter) | 2005 |
| | | **THE DAUGHTER HE NEVER KNEW** (Contract title: Spring Again) | 2005 |